In the Matter of the Estate of HENRY M. RICH, Deceased.

Surrogate's Court, Kings County, June 13, 1934.

*Harry M. Peyser* [*Alex. C. Webber* of counsel], for the State Tax Commission.

*Kaye, McDavitt & Scholer*, for the appellant.

WINGATE, S.   This is an appeal by executors from the *pro forma* order of this court fixing the estate tax.   The ground of complaint is the inclusion by the appraiser as a part of the taxable estate of $51,481.28 of a total of $61,500 transferred by the decedent to a corporation of which he, his wife and two sons were the sole stockholders.   These transfers took place between March 28, 1932, and January 11, 1933.   Decedent died on May 11, 1933.

The law applicable to the situation is clear.   Subdivision 3 of section 249-r of the Tax Law, so far as applicable, provides that there shall be included in the gross estate, for purposes of taxation, all property transferred by a decedent in contemplation of death, " except in case of a *bona fide* sale for an adequate and full consideration in money or money's worth."

It is of course obvious that when any transfer has taken place, the State Tax Commission, from its total unfamiliarity with the facts respecting the transaction, is under a tremendous handicap in any effort to secure for the State the rights which the law gives it. (*Matter of Price*, 62 Misc. 149, 152.)   In an effort to remedy, at least partially, this unequal situation, the Legislature has regulated the pertinent procedure by providing that " Any transfer of a material part of his property made by the decedent within two years prior to his death, without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this article."

It will be obvious that without this last quoted portion of the subsection, the burden of proof would lie upon the Tax Commission to demonstrate that (a) a transfer had been made; (b) that it was not a *bona fide* sale for full consideration, and (c) that it was made in contemplation of death.   The effect of the two-year provision is to shift the burden in respect to the third element when such transfer was of a " material part " of the decedent's property.

As a result, the pertinent questions in any inquiry in this regard are whether (1) a transfer was made; (2) it was of a " material part " of decedent's property; (3) it was made within two years of the

death; (4) it was made for a full consideration in money or money's worth; and (5) it was made in contemplation of death. The burden of establishing the affirmative of the first three elements is on the Tax Commission, which must also establish the negative of the fourth. If, however, it has successfully accomplished its task in these particulars, the burden shifts, and the gift is to be included as estate property " unless shown," obviously by the estate of the decedent, that such transfer was not made in contemplation of death.

It is quite immaterial from a practical standpoint whether this burden, imposed upon the estate by reason of the preliminary demonstration by the Tax Commission, be deemed an absolute burden of proof, or merely a burden of going forward. In any event the factual showing must from the nature of things come from witnesses produced by the estate, whether adduced by its representative or extracted from a presumably unwilling, if not actually hostile, witness by the appraiser or attorney for the Tax Commission. The usual questions for decision, therefore, concern the credibility of the witnesses produced by the estate for the purpose of contradicting the statutory presumption, and whether the inferences to be drawn from the facts to which they have testified, support or contradict the position for which their testimony has been adduced. (*Matter of Bolton*, 230 App. Div. 729; affd., 256 N. Y. 683; *Matter of Jones*, 139 Misc. 31, 37.)

The pertinent portions of the testimony adduced before the appraiser in this case demonstrate that the decedent at his death was " in the fifties," and " was the type of man who worked all his life."

Prior to December, 1931, he had been in business as a copartner in the firm of S. C. Powell & Co., but in the latter part of that year determined that he wished to retire therefrom (Schedule E). Beginning in or about 1929 he had been under medical treatment for the serious heart malady, from which he died, which required frequent attendance of his physician, " sometimes every day during the month," and which on several occasions " required him to go to bed for several days."

His sons undertook the negotiations looking to a closing out of his association with the partnership and effected an arrangement by which the decedent was to be paid $120,000 for his interest, largely by installment payments. One of these sons was a Philadelphia lawyer, and the other was employed in a separate business, presumably in Brooklyn. Although the testimony of both sought to convey the impression that considerable time was devoted to the work of liquidating their father's interest in the business, the fact

remains that the second son was not obliged to discontinue his regular employment on this account and merely took off a certain amount of time from his regular occupation.

After the consummation of these negotiations and in or about February, 1932, the decedent caused an investment corporation to be organized under the laws of Delaware, known as The Rich Company, Inc. It was stated that the decedent, his wife and the two sons each contributed $1,250 to its capital, making a total of $5,000, but no other moneys are shown to have come to it except the transfers which are the subject of present question, and which, as stated, aggregated $61,500. It is not shown that this corporation ever did any business except to loan a part of its funds to the lawyer-son, although on this subject the testimony of the sons appears contradictory. It paid no dividends or bonuses, and its salary list amounted to $600 a year to one son, $500 to another and $250 each to the decedent and his wife.

The transfers by the decedent to the company were made on eight different occasions in sums ranging from $4,000 to $13,000 each, and while originally credited to surplus, this was apparently changed on the advice of accountants for the purpose of avoiding any possibility of liability for a gift tax in 1932, so that the books showed an equal credit to each of the four stockholders. In any event, it is stated that the " minutes show from time to time that the president reported a gift to the corporation by Henry M. Rich in the various amounts making up the said sum of Sixty-one thousand five hundred dollars. The minutes in each instance state that the gift was accepted with thanks."

According to the transfer tax schedules the only property, aside from his interest in the Rich Company, which decedent owned at the time of his death was $20,000 face value of unpaid notes received on the sale of his partnership interest, $2,812.40 worth of general property, which included his watch, etc., savings bank accounts, etc., held jointly with his wife of a value of $6,857.40, and three " Totten trust " accounts, aggregating $5,356.28, in decedent's name as trustee for Jerome J. Rich.

In spite of the noted testimony that decedent " was the type of man who worked all his life," he did nothing after his retirement from Powell & Co., even his connection with the family corporation being " more honor than actual work."

Although an attempt was made to convey the impression that decedent's retirement from business was for the purpose of enabling him to be free to travel and enjoy himself, the only trips demonstrated were one of about ten days in New England in the summer of 1931, a short trip to Philadelphia to visit his son, and a day or so in Westchester.

Attempt was made, also, to establish the fact that the transfers to the Rich Company were payment to the sons for their services in negotiating the settlement of his partnership interest. This is, however, fully refuted by the entries in the corporate books of the fact that the transfers were gifts. The services performed were no more extensive or onerous than those which any father would expect to be gratuitously performed by sons. The inference arising from the relationship of the parties that no payment for such a service was expected is not subject to rebuttal by any demonstration as interested and as weak as that here present. Even were this not so, however, the gross disproportion of the amount paid, to the value of the service rendered, is such as to remove it wholly from the purview of the adequate and full consideration contemplated by the language of section 249-r of the Tax Law. If a regularly admitted attorney had charged as much as $3,000 for the service here indicated, the decedent undoubtedly would have branded him a robber and refused to pay. The mere fact that the service was performed by a son does not increase its value, or transform into earned remuneration that which is in essence a gift.

It follows that the Tax Commission has successfully demonstrated the four essentials in respect to which the burden rests upon it. Transfers were concededly made. They possessed a value of approximately three-quarters of decedent's estate and were, therefore, a " material part " thereof. They were concededly made within two years of death and were not made for a full consideration in money or money's worth.

The burden thereupon shifts to the estate to show that these transfers were not made in contemplation of death as a matter of fact. Even were the demonstration much less clear than it here is that appellants have failed to sustain this burden, the court would hesitate to reverse the determination of the appraiser in this respect. He has here acted in a judicial capacity (*Matter of Dunne*, 138 Misc. 840, 844), and it is primary that an appellate court, which has not seen or heard the witnesses, is properly hesitant, in the absence of a demonstration of palpable error, to reverse a factual determination by a judicial officer who has enjoyed that advantage. (*Matter of James*, 148 Misc. 124, 125, 126; *Matter of Enright*, 149 id. 353.)

In the present instance, however, this court would unquestionably reach the same result as that attained by the appraiser. The assertion of the interested sons that the decedent was unaware of his condition is incredible in view of the demonstrated facts. The testimony of the physician " that he never knew he was in any *immediate* danger of death " probably approximates the truth.

To assert that a man, in the prime of life, a worker by nature, who had been under constant medical attention for upwards of four years for an ailment which might prove fatal at any moment and which actually caused his death, who abandoned all occupation and apparently settled down to die, albeit cheerfully, and simultaneously divested himself of as much of his property as it was reasonably possible for him to do, was not contemplating death within the meaning of the statute, is to stretch credulity to the breaking point. All of the parties connected with the affair were obviously tax conscious to a degree, but their well-laid plans cannot be permitted to deprive the State of New York of the tax exaction which is properly its due.

The appeal is dismissed.

Proceed accordingly.